## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 23-22744-CIV-ALTO NAGA/Damian

**GLOBAL PAYCARD CORPORATION**,

Plaintiff,

v.

**ONECOM LLC**, *et al.*,

Defendants.

_____/

### PLAINTIFF'S SECOND AMENDED COMPLAINT

Plaintiff Global Paycard Corporation d/b/a Kittrell Paycard ("Kittrell") seeks relief from this Court against Defendants, Onecom, LLC, My Fast Funds, LLC, Rocket One Capital, LLC, Michael Shvartsman, Jeffrey Foster, and Michael Park (collectively "Defendants").

## I.  INTRODUCTION

1.      Kittrell is a paycard company. It offers employers a convenient way to pay their employees by directly depositing the employee's pay to a Kittrell Paycard account which the employee can use to access their funds via a Kittrell Paycard. In 2015 Kittrell entered into a five-year agreement with Cardplatforms, LLC ("CP") to manage the services connected with the paycards distributed by Kittrell to its clients.  As part of this agreement CP would collect the program revenues and pay Kittrell a percentage based upon the amount of revenue generated through Kittrell's paycards.

2.     When the Kittrell agreement was executed, CP was already actively servicing a paycard program ("the Program") through an agreement it had with Stride Bank (f/k/a Central Nat'l Bank & Trust Co. of Enid).  In August 2016, CP renewed its agreement with Stride Bank (f/k/a Central Nat'l Bank & Trust Co. of Enid.) which retained "full control and continued oversight over the Programs...." Stride Bank issued the cards and supervised the Program; CP provided certain marketing and servicing in connection with the card Program; Kittrell generated sales and revenue for the Program and provided customer support for employers enrolled in the Program.

3.     During 2018 and 2019 Kittrell saw a significant decline in the services provided by CP and unjustified delays in payment.  On October 7, 2019, Kittrell formally notified CP that it was in breach of the Agreement.  On December 25, 2019, Kittrell notified CP that it was not going to renew the management agreement when it expired in June 2020.  Little did Kittrell know, at that time Defendants and their associated affiliates, members, managers, and investors were engaged in a scheme to divest CP of all of its assets, divert the ongoing monthly proceeds generated by Kittrell and other Program clients to themselves, and cheat Kittrell out of the proceeds it had rightly earned.

4.     This scheme was orchestrated and implemented by Michael Shvartsman, Jeff Foster, and Michael Park.  The vehicles for this scheme were Onecom, LLC and the other company Defendants.

147998786.1

5.      Plaintiff brings this lawsuit to recover the revenues it is owed through the Program that were wrongly taken by Defendants.

## II.  PARTIES

6.      Plaintiff, GLOBAL PAYCARD CORPORATION d/b/a KITTRELL PAYCARD ("Kittrell"), is a Texas corporation with its principal place of business in Dallas County, Texas.

7.      Defendant, ONECOM, LLC ("Onecom"), is a Delaware limited liability company.  It has been served and has appeared in this lawsuit.

8.      Defendant, MY FAST FUNDS, LLC, is a Florida limited liability company that has waived service and appeared in this lawsuit.

9.      Defendant, ROCKET ONE CAPITAL, LLC, is a Florida limited liability company that has waived service and appeared in this lawsuit.

10.     Defendant, MICHAEL SHVARTSMAN, is an individual citizen of Florida who has waived service and appeared in this lawsuit.

11.     Defendant, JEFFEREY FOSTER, is an individual citizen of Florida who has waived service and appeared in this lawsuit.

12.     Defendant, MICHAEL G. PARK, is an individual citizen of Florida who has waived service and appeared in this lawsuit.

## III.  JURISDICTION & VENUE

13.     The Court has diversity jurisdiction under 28 U.S.C. § 1332.

14.     This lawsuit was transferred from the Northern District of Texas (Dallas Division) to this Court pursuant to 28 U.S.C. § 1404(a) upon Defendants'

147998786.1

motion.

## IV.  EXHIBITS

15.    Plaintiff relies upon the Exhibits A – OO in support of its *Second Amended Complaint* and incorporates same herein as if set forth in full.

## V.  FACTS

### A.    Cardplatform / Kittrell Paycard / Stride Bank

16.    On June 10, 2015, Kittrell entered into a five-year agreement with Cardplatforms, LLC ("CP") to manage the services connected with the paycards distributed by Kittrell to its clients.[1]  Kittrell marketed its paycard services to employers throughout the country with great success. On August 1, 2016, CP renewed and amended its agreement with Stride Bank which set forth CP's duties towards the Program.[2]  Despite occasional hiccups the Program ran as planned, but in 2018 and 2019 Kittrell began notice servicing issues and payment issues from CP.  Unknown to Kittrell, CP was having financial issues with its investors.

17.    In September 2016, CP executed a series of promissory notes to CP investors in the aggregate amount of $1,975,000.00.[3]  The primary investor was Ellis Lake, LLC ("Ellis Lake") who invested $1,250,000.00. These notes were secured "by a blanket security interest in all of the assets of [CP]...."  In June 2018, CP was in default on these notes. The investors agreed to execute a Forbearance

---

[1] Exhibit A
[2] Exhibit B
[3] Exhibit C

147998786.1

Agreement and extended the life of the Promissory Notes upon the occurrence of certain conditions.  The investors and CP then entered into a *Third Amendment to Series Promissory Notes with Warrants*.[4]  As will be explained below, this played an integral role in how Defendants structured their divestment scheme.

18.    Throughout 2019 Kittrell continued to have payment and service problems with CP.  Stride Bank was also having issues with CP.  In June of 2019, Stride Bank notified CP that it had identified "severe UDAAP/UDAP concerns."[5] UDAAP/UDAP refers to UNFAIR OR DECEPTIVE ACTS OR PRACTICES (UDAP) under Section 5 of the Federal Trade Commission Act (FTC Act) and UNFAIR, DECEPTIVE, OR ABUSIVE ACTS OR PRACTICES (UDAAP) pursuant to the Dodd-Frank Wall Street Reform and Consumer Protection Act (Dodd-Frank Act).

19.    In August Stride Bank notified CP about its concerns that the processor system provider, i2c, which provided and serviced the software through which the Program operated, was cancelling its services due to CP's failure to pay its invoices.[6]  During this time CP was also failing to pay Kittrell.  On October 7, 2019, Kittrell sent CP a demand letter requesting payment for the past due revenues it was owed as well as an independent audit.[7]  This request was ignored.

20.    In November, i2c had still not been paid.  Foster assured Stride Bank that CP had "lined up a small interim financing in order to pay i2c and a few other

---

[4] Exhibit D
[5] Exhibit E
[6] Exhibit F
[7] Exhibit G

147998786.1

bills prior to our closing the larger deal."[8]  What the "larger deal" might be was not explained, but none of the interim financing obtained was used to pay Kittrell the money it was owed through the Program.  Foster continued to ignore all of Kittrell's inquiries.

21.    On December 25, 2019, Kittrell notified CP of its intent to terminate their agreement at the end of the five-year term in June 2020.  Kittrell wrote: "Due to the uncertainties you've created over the last 2 years, I have spoken with Stride Bank and am working to become a Project Manager directly with them."[9]  Kittrell's monthly revenue share payments for the balance of 2019 were not paid until late February 2020.  **This was the last payment Kittrell ever received**.

22.    Although Kittrell paycards continued generating revenue for the Program all through 2020 and up until July 7, 2021 when the Program was formally terminated, Kittrell was never paid its share of the monthly revenue generated by the paycards which bore Kittrell's name and brand.  Shvartsman, Foster, and Park had conspired a scheme through which it could pay off its investors and pocket the revenue generated by Kittrell's efforts.

---

[8] Exhibit H
[9] Exhibit I

**B.      Cardplatform to Onecom**

23.      On December 19, 2019, Shvartsman and Foster formed Onecom LLC.[10]  The members of the new Onecom LLC were My Fast Funds, LLC (wholly owned by Foster) and Rocket One Capital LLC (wholly owned by Shvartsman).

24.      Both Stride Bank and Kittrell were initially kept in the dark about the formation of Onecom.

25.      Instead, the creation of this "new" company was advertised on Cardplatform's web site as if it were a mere name change:



26.      Onecom's announcement characterized it as a "name change and new corporate brand identity" to "better reflect the evolution of the company...."  This

---

[10] Exhibit J

147998786.1

characterization was false and deceptive. The creation of this new organization was the first step by Shvartsman, Foster, and Park in their scheme to strip CP of its assets and redirect the revenue stream generated by Kittrell and CP's other clients into their own pockets.

## C.    The Scam

### 1.    Step One:    Transfer Stride Bank agreement from CP to Onecom.

27.    The first thing that Shvartsman, Foster, and Park had to do in order to perpetrate their scheme was to lock down Onecom's succession into CP's position in the Program.  They needed Stride Bank's approval in order to transfer CP's contractual rights to Onecom. CP provided Stride Bank with two agreements[11] between CP and Onecom:   1) an *Intellectual Property and Domain Name Assignment* ("IP Assignment")[12], and 2) a *Bill of Sale and General Assignment* ("Bill of Sale")[13]. These agreements were executed on December 31, 2019.  Foster signed these self-dealing agreements on behalf of CP as its CEO.  Shvartsman signed on behalf of Onecom as its "Director".  Both of these documents reference an *Asset Purchase Agreement* purportedly to have been executed on December 31,2019 contemporaneously with these two agreements.  But an executed copy of

---

[11] Neither of these documents were produced by Onecom in response to the limited discovery conducted so far in this matter.  These documents were recently obtained from Stride Bank pursuant to a subpoena.
[12] Exhibit K
[13] Exhibit L

8

this *Asset Purchase Agreement* was not produced by Onecom in its discovery responses.

28.    These agreements appeared to support what Foster and Shvartsman represented to Stride Bank and what CP represented to the world in its advertising – that CP was simply transferring its assets to Onecom and that Onecom would continue servicing the Program pursuant to the existing arrangements. However, these agreements produced to Stride Bank were merely a sham to get Stride Bank to assent to plug Onecom into the Program in place of CP.

29.    A flurry of events occurred in January 2020.  On January 16, Foster finally emailed[14] an unexecuted *Asset Purchase Agreement* to Stride Bank in order to facilitate the transfer of the Program agreement from CP to Onecom.[15]  This unsigned agreement was dated effective January 10, 2020.  This contradicts Foster's earlier representation an agreement had been executed on December 31st as stated in the Bill of Sale.  Foster also provided Stride Bank a *Disclosure Schedule*[16] which is notable in that 1) the only "Excluded Assets" listed was the office lease CP had in Salt Lake City and 2) the "Assigned Contracts" included an assignment of the Kittrell agreement from CP to Onecom.  Like the Bill of Sale and IP Assignment, this agreement was also a sham.

---

[14] Exhibit M
[15] Exhibit N
[16] Exhibit O

30.    Emails from January 22-27 between Stride Bank, Shvartsman, and Foster show that Stride Bank was trying to secure the necessary documentation in order to facilitate the transfer from CP to Onecom.[17]   Shvartsman and Foster continued to represent that this was still just a simple asset transfer.

31.    However, a January 28 email from Stride Bank to Shvartsman, Foster, and Park showed that the bank's suspicions were raised.[18]  Park's response was filled with misdirection, half-truths, and outright lies as the following email excerpt shows (Park's responses are in blue):[19]

Chelsea,

Our responses are in *Blue* below.

- Please clarify how Jeff remains the 100% owner of OneCom with the funds coming from Mr. Shvartsman's company.
  - Is this money a loan or does, Mr. Shvartsman or his company have any ownership percentage in OneCom? *Jeff is the sole party involved in forming Onecom, as reflected on the Articles of Organization. Rocket One Capital will loan the funds necessary for Onecom operations, and it is anticipated that Mr. Shvartsman (likely through another entity) will exchange the loans for equity at some point in the future, but a specific time has not yet been determined.*
  - Provide a CAP Table? *As there is only a single member (Jeff Foster), no Cap Table is provided.*
  - At this time can we confirm none of the previous owner's listed on the CardPlatforms CAP table dated 10/06/2019 will/are invested in OneCom? *Correct. None of the previous owners of Cardplatforms are invested in Onecom.*

---

[17] Exhibit P
[18] Exhibit Q
[19] The blue font is in the original.  In addition, the blue font has been italicized in case the blue font does not show up in the Court's ECF system.

147998786.1

- ○ Presently will there be any additional investors in OneCom? *Presently there are no additional owners anticipated for Onecom.*
- Provide OneCom Articles of Incorporation *Provided in Box folder.*
- While we were able to locate an active SOS in Florida for Foundation Capital, my notes say the entity was recently renamed to Rocket One Financial.
- ○ Confirm where Rocket One is located and incorporated?
- ▪ Will they provide Articles of incorporation/ Amended Name Change? *Foundation Capital LLC, a Florida LLC, is in the process of being renamed to Rocket One Capital. The process at the Florida Secretary of State can take several weeks. Once the name change is completed, we will provide a copy of the filed Articles of Amendment.*
- A Balance Sheet for Foundation Capital was referenced but not provided, please provide. *This is being finalized and I will advise when it is placed in Box folder.*
- While Projections for OneCom were received, a pro forma financial statement were not, please provide. *This is being finalized and I will advise when it is placed in Box folder.*
- The address listed for OneCom is listed as <u>11451 NW 36th Ave, Miami, FL 33167</u>; when we search it some up as Hialeah, FL. The business location for appears to be some sort of distribution center for commercial transportation, please confirm this is the correct location? *This is the correct location. Mr. Shvartsman's brother, Gerald Shvartsman, operates an outdoor furniture manufacturing business (Source Furniture LLC) in a majority of the property, and Mr. Shvartsman uses some of the office space for his businesses.*
- ○ The review notes this is also an address for Foundation Capital, will OneCom be operating out of Foundation Capital's office space? *Onecom's Florida based employees mostly work remotely, but will use the Foundation Capital office space when needed.*
- ○ Are other business located in this building? *Mr. Shvartsman has several businesses, and he uses this office for all of them.*
- ○ Will the Utah office still operate? *Yes, the Utah office will still operate. It has moved to new space at 352 S. Denver Street, Ste 202 + 250, Salt Lake City, UT 84111.*
- Provide OneCom Org Chart outlining remaining (any new?) staff roles and responsibilities. *Provided in Box folder.*
- Will the Audit Schedule provided 01/03/2020 be adhered to? *Yes, Onecom will adhere to the Audit Schedule.*
- Regarding the pending litigation against CardPlatforms reported through Annual Review efforts, how will those now proceed? *Onecom*

*will not assume any of Cardplatforms' liabilities. The pending litigation against Cardplatforms will remain with Cardplatforms.*

32.     In reliance on the representations of Shvartsman, Foster, and Park, Stride Bank finally executed its *Approval of Assignment*[20] on February 3rd.  The recitals of the Approval stated:

> WHEREAS, CP and Approving Party entered into that certain Amended and Restated Prepaid Card Account Issuance Agreement dated August 1, 2016 (the "**Agreement**");
>
> WHEREAS, CP desires to sell substantially all of its assets to Onecom (the "**Sale**"), including the Agreement, and Onecom has agreed to assume all of the duties and obligations of CP under the Agreement; and
>
> WHEREAS, pursuant to the Agreement the approval of the Approving Party is required for the assignment of the Agreement in connection with the Sale.

33.     This shows that Onecom represented to Stride Bank that its was selling substantially all of its assets to Onecom and that Onecom agreed to assume all of the duties and obligations of CP in the Program.  These obligations and duties would include paying Kittrell the revenues it had earned through the Program.

34.     Step One was completed – Onecom had stepped into the shoes of CP in the Program.

## 2. Step Two:  Move CP's assets to an undisclosed entity.

35.     While Shvartsman, Foster, and Park were negotiating with Stride Bank in order to get CP off of the Program, it was also having to deal with its unhappy investors.  Foster represented to Stride Bank that there was a done deal

---

[20] Exhibit R

147998786.1

between CP and Onecom as of December 31st, but this was not the case. The chronology of the following events is important because it shows that there was a lot going on behind the scenes.

36. On January 21, 2000 the CP investors formed a Delaware limited liability company: CP ASSETS LIQUIDATION, LLC ("CAPL"). Their capital contributions and interest percentage mirror their respective amounts owed them under the series of promissory notes –

### SCHEDULE A

| Name and Address | Original Principal Amount of Contributed Note | Date of Contributed Note | Percentage Interest |
|---|---|---|---|
| Ellis Lake LLC<br>444 Madison Avenue, 40th Floor<br>New York, NY 10022 | $1,250,000.00 | 9/27/2016 | 63.30% |
| Brandon Dunn<br>c/o Ellis Lake LLC<br>444 Madison Avenue, 40th Floor<br>New York, NY 10022 | $250,000.00 | 9/27/2016 | 12.66% |
| Steve Goldstein<br>c/o Ellis Lake LLC<br>444 Madison Avenue, 40th Floor<br>New York, NY 10022 | $150,000.00 | 9/27/2016 | 7.59% |
| Jay Braunstein<br>c/o Ellis Lake LLC<br>444 Madison Avenue, 40th Floor<br>New York, NY 10022 | $100,000.00 | 9/27/2016 | 5.06% |
| Mike Nechamkin<br>c/o Ellis Lake LLC<br>444 Madison Avenue, 40th Floor<br>New York, NY 10022 | $100,000.00 | 9/27/2016 | 5.06% |
| Steve and Felice Brostoff<br>c/o Ellis Lake LLC<br>444 Madison Avenue, 40th Floor<br>New York, NY 10022 | $125,000.00 | 12/15/2016 | 6.33% |
| Total: | $1,975,000.00 | | 100.00% |

The formation of this company, created with the obvious intent to gut all of the assets of CP, was kept hidden from Stride Bank, Kittrell, and all of the other stakeholders in the Program.

147998786.1

37.    On January 22, 2020, while Shvartsman, Foster, and Park were negotiating an agreement of assignment with Stride Bank, Jay Braunstein, principal member of Ellis Lake, LLC (CP's primary creditor) and managing member of the newly formed CPAL, sent CP a formal notice of default and acceleration.[21]  This was not disclosed to Stride Bank, Kittrell, or any of the other stakeholders in the Program.

38.    On January 27th, the same day that Shvartsman, Foster, and Park were trying to get Stride Bank to approve their already "consummated" agreement, CP issued the following announcement:



January 27, 2020

To all Cardplatforms Shareholders and Stakeholders:

As you know, Cardplatforms has been seeking a buyer for the company or its assets. In mid-December 2019, we negotiated the sale of substantially all of the assets of the company to a third party. All of the proceeds from this transaction would have gone to the senior secured lender, but we were able to obtain the right to distribute ten percent (10%) of the equity in the purchaser to the current shareholders and unsecured lenders of Cardplatforms.

Unfortunately, after receiving a notice of objection from one of Cardplatforms' Class A Members, the purchaser was unwilling to complete the purchase. Following this, the senior secured lender notified Cardplatforms to turn over all of its assets in accordance with their rights. Cardplatforms has no viable defenses to the demand for its assets, based on agreements negotiated by the prior Board of Directors. Accordingly, the current Board of Directors has no option but to comply with the demand.

I am very sorry that we were unable to complete the transaction that would have benefitted all of the shareholders and unsecured lenders. I see no option but the closure of Cardplatforms, and will work to make that process as easy for everyone as possible.

Sincerely,



Jeff Foster, CEO

---

[21] Exhibit S

Contrary to the assertions in the announcement, a deal had been done. But it was a self-dealing deal between Shvartsman, Foster, Park, and Braunstein to misdirect the monies earned by Kittrell and the other Program members.

39.     On January 31, 2020, the CP investors, led by Jay Braunstein,[22] executed the following documents: 1) *Assignment of Series Promissory Notes With Warrants*;[23] and 2) *Subscription & Contribution Agreement* ("S&C Agreement").[24,25]   The assignment effectively transferred all of the individual promissory notes held by the CP investors to CPAL. The S&C agreement granted each individual CP investor a *pro rata* share in CPAL. As noted above, on February 3rd, while these transactions and agreements taking place, Stride Bank approved the assignment of CP's agreement with the bank to Onecom – with the understanding that Onecom would assume CP's obligations and responsibilities under the Program.

40.     On February 6, 2020 a series of transactions occurred between CP, Onecom, and CPAL:

*Agreement & Consent to Surrender of Collateral* ("Consent Agreement")[26]

---

[22] Following further discovery in this matter, Braunstein may be added to this lawsuit as a co-conspirator.
[23] Exhibit T
[24] Exhibit U
[25] Exhibit V - Onceom also produced an *Approval of Transfer of Assets* in which the CP investors approved the transfer of assets from CP to Onecom, but this document was not executed.
[26] Exhibit W

41.     This agreement between CP and CPAL documents the transfer of CP's assets ("Secured Collateral") to CAPL in exchange for the retirement of the "Secured Indebtedness" in the amount of $1,230,000.00.   This Consent Agreement belies the representations made by Shvartsman, Foster, and Park that CP was transferring its assets as well as its duties and obligations under the Program directly to Onecom.  This Consent Agreement was executed by Foster as CEO of CP and by Jay Braunstein as the "Principal" of Ellis Lake, the managing member of CAPL.

42.     The Consent Agreement had three exhibits:   Exhibit A   – *Surrendered Collateral*;[27] Exhibit B – *Cardplatforms LLC Representations and Warranties*;[28] and Exhibit C – *Disclosure Schedules*.[29]   Exhibit A lists Kittrell's Program agreement as one of the "Assigned Contracts" being transferred to CPAL.[30] Note that the agreement acknowledges that Kittrell was entitled to 30 days' notice of assignment under the Program agreement.  Kittrell was never given notice of the assignment and was kept in the dark about this entire series of transactions involving its Program agreement.  Kittrell was still operating under

---

[27]Exhibit X
[28] Exhibit Y
[29] Exhibit Z
[30] See Exhibit X, Art. IV(1)(E):

> E.  Prepaid Debit Card Program Management Agreement between Debtor and Global Paycard Corp., d/b/a Kittrell Paycard dated as of June 10, 2015, subject to 30 days notice of assignment pursuant to section 10.9 of the Agreement.

147998786.1

the belief, as represented on Onecom's website, that "Cardplatforms is now Onecom."

43.     In Section 1.02 of the *Representations and Warranties* CP avers that the Consent Agreement will not:

> Conflict with, or result in (with or without notice or lapse of time or both) any violation of, or default under, or give rise to a right of termination, acceleration or modification of any obligation or loss of any benefit under any contract or other instrument to which [CP] is a party or to which any of the Surrendered Collateral are subject....

> No consent, approval, waiver or authorization is required to be obtained by Debtor from any person or entity (including any governmental authority) in connection with the execution, delivery and performance by Debtor of this Agreement and the consummation of the transactions contemplated hereby, except as may be set forth on the Disclosure Schedules.

44.     Section 1.06 of the *Representations and Warranties* expressly addresses "Assigned Contracts."

> **Section 1.06   Assigned Contracts.** The Disclosure Schedules include each contract included in the Surrendered Collateral or related to the Business (defined below) of Debtor (the "**Assigned Contracts**"). Each Assigned Contract is valid and binding on Debtor in accordance with its terms and is in full force and effect, except as may be set forth on the Disclosure Schedules where such invalidity or lack of binding nature, if any, will be expressly set forth by Debtor. Where any such approval or consent is necessary, Debtor shall obtain same in keeping with the terms of the relevant contract to be assigned. None of Debtor or, to Debtor's knowledge, any other party thereto is in breach of or default under (or is alleged to be in breach of or default under), or has provided or received any notice of any intention to terminate, any Assigned Contract, except as may be set forth on the Disclosure Schedules. No event or circumstance has occurred that, with or without notice or lapse of time or both, would constitute an event of default under any Assigned Contract or result in a termination thereof or would cause or permit the acceleration or other changes of any right or obligation or the loss of benefit thereunder, except as may be set forth on the Disclosure Schedules. Complete and correct copies of each Assigned Contract have been made available to Secured Party. There are no disputes pending or threatened under any Assigned Contract, except as may be set forth on the Disclosure Schedules. For purposes hereof, the term "**Business**" means the Debtor's business of acting as program manager and issuer of prepaid debit cards and supplier of corporate payment services.

45.     These warranties are patently false.[31] Foster executed the Consent Agreement, under seal of a notary, on February 6, 2020.  He knew as of October 7, 2019 that CP was in breach of its Program Agreement with Kittrell.  He knew that as of December 25, 2019 Kittrell was terminating the Program Agreement in June of 2020.  He also knew that CP was continuing to breach Kittrell's Program Agreement by refusing to pay Kittrell the revenues it had earned and was owed through the Program.  He knew that there were "disputes pending or threatened." The preamble of the Representations and Warranties defines debtor's knowledge:

> "'Debtor's knowledge', 'knowledge of Debtor' and any similar phrases shall mean the actual or constructive knowledge of Debtor and of any director or officer of Debtor, after due inquiry."

From CP's standpoint, these representations and warranties are purely a sham.

46.     Schedule 1.06 of the Disclosure Schedules referenced in the Representations and Warranties lists the Assigned Contracts and mirrors Surrendered Collateral in that it lists Kittrell's Program Agreement as one of the thirteen Program Agreements transferred from CP to CPAL.

47.     Step Two was completed – all of CP's assets, including Kittrell's Program Agreement, had been transferred to CAPL without the knowledge of Stride Bank or Kittrell, and contrary to the representations Shvartsman, Foster,

---

[31] Whether Braunstein new that these representations were outright falsehoods or, rather, was duped by Foster is unclear.  However, the nature of the totality of the transactions makes the latter proposition dubious at best.

147998786.1

and Park made that Onecom was assuming CP's duties and obligations under the Program.

**3.  Step Three:  Get the money out of the Program and to the investors.**

48.    The transactions on February 6, 2020 were not concluded.  CAPL and Onecom executed an *Asset Purchase Agreement*[32] and a *Bill of Sale & General Agreement*[33] by which CAPL purports to sell to Onecom the Surrendered Collateral it just obtained from CP including the Kittrell Program Agreement. The purchase price was $1,230,000.00.  Section 1.03 of the Asset Purchase agreement states:

> **Section 1.03  No Liabilities.** Anything provided elsewhere herein to the contrary notwithstanding, Buyer does not hereby, and shall not under any circumstances, assume any liabilities or obligations of Seller or of CP, or any liabilities or obligations in any way related to or associated with any of the Purchased Assets, of any kind, nature, or description whatsoever, whether known or unknown, contingent, matured or otherwise, and whether currently existing or hereinafter created.

49.    In other words, Onecom is claiming that it is purchasing all of the Program Agreements (including Kittrell's) from CAPL, but that Onecom is not assuming any of the liabilities or obligations of those agreements.  Of course, as is explained below, it will continue to receive and accept all of the revenues generated by those Program Agreements due to the sham perpetrated by Shvartsman, Foster, and Park on Stride Bank, Kittrell, and the other participants in the Program.

50.    The same or similar representations and warranties given by Foster to Braunstein in the CP/CAPL transfer were **_reversed_** in the CAPL/Onecom transfer.   Braunstein claims that no consent or approval is necessary for the

---

[32] Exhibit AA
[33] Exhibit BB

147998786.1

transfer of the Program Agreements.[34]  He also shifts the burden back on CP claiming that CAPL did no independent investigation over the accuracy of CP's representations and warranties and that Onecom's only recourse in the event of a breach of those warranties is against CP and not against CAPL.

> **Section 3.05  Representations and Warranties of CP.** As part of the Collateral Surrender Agreement, Seller obtained from CP various representations and warranties as related to the Purchased Assets. Seller has no information or knowledge (without independent investigation) that such representations or warranties are inaccurate in any material respect and has taken no acts whatsoever since obtaining title to the Purchased Assets or since the date of the Collateral Surrender Agreement to render such representations and warranties inaccurate as of the date of this Agreement and will take no such steps through the effectiveness of the Closing hereunder. The benefit of all representations and warranties of CP contained within the Collateral Surrender Agreement are specifically made a part hereof as being representations and warranties associated with the Purchased Assets for the benefit of Buyer, and Buyer shall have legal rights against CP, but not Seller, as and to the fullest extent that such representations or warranties prove to in any way be inaccurate.

51.     In other words, Shvartsman can sue himself and Foster should it turn out that he and Foster made misrepresentations to Braunstein and the investors, investors who are all long standing business partners with Shvartsman and Foster. This is no arm's length transaction but rather a series of deceptive self-dealings.

52.     In connection with this transaction Braunstein and Gabriel Nechamkin (an Ellis Lake, LLC manager) executed a *Certificate of the Manager of CP Assets Liquidation, LLC.*  This Certificate included as exhibits CAPL's certificate of formation, the company agreement (including list of members), and the company resolution approving the acceptance of CP's assets to extinguish the

---

[34] See Exhibit Z - Asset Purchase Agreement, Sec. 3.03.

promissory notes, and the contemporaneous transfer of those assets from CPAL to Onecom. [35]

53.    At 10:37 a.m. on February 6, 2020, Onecom sent a wire transfer in the amount of $1,130,000.00 to Ellis Lake, LLC, managing member of CAPL.[36]

54.    Step Three was completed – the promissory notes were extinguished, and all of the money was in the hands of Ellis Lake, LLC.

## 4. The Shakedown

55.    Kittrell knew nothing of the fraudulent schemes and machinations that Shvartsman, Foster, and Park had undertaken without its knowledge.  It was simply trying to get paid the monies it was owed.  This culminated in a telephone conversation with Mary Kittrell, Shvartsman, and Park on or about February 28, 2020.  Shvartsman memorialized this phone call in the following email[37]:

---

[35] Exhibit CC
[36] Exhibit DD
[37] Exhibit EE

147998786.1

Hi Mary,

Great speaking with you,

I wanted to summarize the key points on todays' call and the opportunities presented by the new OneCom team and your company.

- We appreciate the work you are doing and value your business and going forward want to see how we can make you more successful for the benefit of both of us
- We want to help you grow your business and increase the revenues you see from the Kittrell Paycard program
- We are willing to invest in your programs and potential business ideas to drive more revenues
- OneCom is a separate entity from the former Card Platforms (CP) and in February we purchased the assets of CP
- Going forward if we agree to work together our OneCom team we will ensure your monthly revenue share payments are honored and paid on time.

We want to thank you for time today and want to be a valued partner and enabler for your business.

Please feel free to call me if you have any questions. Looking forward to speaking again soon.

Thank you,

Michael Shvartsman
CEO
OneCom Inc.

56.     This communication is full of deceptive and misleading statements. To begin with, Shvartsman signs this communication as CEO of OneCom, Inc. which is contrary to Foster's representation that he is, in fact, CEO of Onecom. Shvartsman states that he appreciates Kittrell's business while also stating, in effect, that Onecom does not actually have a business relationship with Kittrell. Shvartsman says that Onecom is a separate entity from CP which directly contradicts CP's announcement that "Cardplatforms is now OneCom!" Shvartsman states that "in February we purchased the assets of CP." Given the series of transactions outlined above this statement is patently false. There is no privity between CP and Onecom. He fails to disclose anything about CAPL and the

147998786.1

liquidation of CP.  But he has to maintain the charade that Onecom has simply stepped into the shoes of CP to maintain the wholly deceptive picture he painted with Stride Bank.

57.     Then there is the shakedown:

"Going forward if we agree to work together our OneCom team we will ensure your monthly revenue share payments are honored and paid on time."

Or, in the converse, it effectively says to Kittrell:

If you don't agree to rescind your June termination and reenroll with Onecom, we will ensure that your monthly revenue share payments are NOT honored and NOT paid on time.

58.     This shakedown was underscored in Park's correspondence to Kittrell five days later on March 6, 2020.[38]  This correspondence contains numerous false and deceptive statements (as well as some admissions):

"As you are aware, a majority of the assets of Cardplatforms LLC were acquired by Onecom, LLC.  In light of your non-renewal, your Agreement has not been assumed by Onecom, although Onecom has thus far maintained the services for your account."

59.     Onecom did not acquire a majority of the assets of CP. This was a blatant falsehood incepted to dupe Stride Bank into transferring the Program into the name of Onecom so that Onecom and its company members (Rocket One and My Fast Funds) and their sole owners (Shvartsman and Foster) could continue receiving the revenues generated through the Program.  In actuality, CAPL

_____

[38] Exhibit FF

acquired the CP assets and gutted them.  Park claims that Onecom did not assume Kittrell's Agreement despite the fact that it is listed as an "Assigned Contract" in every single one of the Disclosure Schedules in all of the fraudulent transactions previously described.   Tellingly, Park **admits** that Onecom has continued servicing the Kittrell accounts (and pocketing the money generated therefrom).

60.     Then there is the shakedown, part two:

> "In order to maintain program services with Onecom for your account you will need to sign a new agreement with Onecom.  The financial terms of that agreement will not be identical to the existing Agreement.  Please advise if you want to enter into a new agreement with Onecom, and we will prepare one."

Onecom is taking the position that it has no obligations to Kittrell even though it is going to continue servicing Kittrell's account and start the wind down process that will take approximately four to six months.  All the while, pocketing the revenues generated by Kittrell's paycards and not paying Kittrell its share of the revenues.

61.     From March 6, 2020 to the present it has simply been a continuing pattern of evasion and obfuscation by the Shvartsman, Foster, and Park regarding the amount and the location of Kittrell's earned revenues under the Program.

**D.      Who got the money?  Where did it go?**

62.     Assuming, solely for the sake of argument, that the machinations and deceptions set forth above are completely aboveboard and legitimate, the underlying fact remains – **someone continued to receive all of the revenues generated by Kittrell's paycards.**

63.    Following Stride Bank's Approval of Assignment, Onecom continued providing services through the Program.  From January 1, 2020 to termination of the Program in July, 2021, Kittrell's paycards continued to generate revenue. Onecom also continued having serious compliance issues.  In an email to Stride Bank on March 24, 2020 Foster admits – "During the end of 2019, Cardplatforms was having financial difficulties which resulted in a purchase of their assets by OneCom in early February 2020." [39]  Foster maintains the false representation that Onecom simply stepped into the shoes of CP rather than admit that the assets were acquired and liquidated by CPAL.  In the same email Foster makes the following admissions:

> OneCom investigated various options to bring the 24 hours service back online, but determined that it would still be unsustainable under the current contracts. With that in mind, OneCom began engaging with impacted clients, namely Kittrell, to renegotiate the contract or officially change the live agent policy. OneCom is still pursuing these conversations and understands that the length of time it has taken to resolve the customer service adjustments has taken longer than expected. OneCom believes that its current service is meeting the needs of cardholders in a timely manner, but will seek to improve cardholder service in response to any client or bank concerns.

64.    The admissions are essentially that 1) Onecom is continuing to service the Kittrell accounts, 2) Kittrell is an "impacted client", and 3) Onecom believes that its "current service" is meeting the needs of the cardholders.

65.    Despite these assurances, Onecom continued to have serious compliance issues with the Program. On October 22, 2020 Stride Bank terminated

---

[39] Exhibit GG

its agreement with Onecom effectively ending the Program. [40]   Stride Bank noted that the termination was the "result of OneCom's multiple, material failures to observe or perform its obligations...."   Stride Bank further noted that pursuant to the Program Agreement "the obligations of Cardplatforms bind OneCom as the successor to Cardplatforms."[41]   They then initiated a Wind Down Period that culminated in July 2021.

66.   From January 2020 through July 2021 Oncom continued to receive deposits from Stride Bank which included revenues generated by Kittrell paycards[42] while maintaining it had no contractual obligations under the Program and specifically to Kittrell.[43]   Onecom has maintained the position that 1) it has no duty of any kind to Kittrell, and 2) that it is entitled to receive and keep Program revenues generated by Kittrell's paycards. It maintained this position in its pleadings before this Court while simultaneously enlisting Kittrell's active support in implementing the Wind-Down Plan.[44]

---

[40] Exhibit HH
[41] This flies in the face of Onecom's untenable position that it is entitled to the revenues generated by the Program but it not responsible for any obligations under the Program.
[42] Exhibit II
[43] Kittrell brought her state court action in February 2021.
[44] Kittrell participation in the Wind Down Plan was an absolute necessity in order to protect the interests of its clients and their employees who held and were using Kittrell's paycards for their basic living functions.  Kittrell has successfully transitioned to a direct relationship with Stride Bank and, despite the loss of over a half-million dollars in revenues due to Defendants' malfeasance, has managed to maintain and build its business.

147998786.1

67.     On information and belief, Kittrell's share of the Program revenues from January 2020 through July 2021 is in excess of $600,000.00. It is undisputed that these revenues were earned by Kittrell.  Defendants openly admit they received these funds.[45]  Instead, they rely on a conspiracy of fraud, deception, and tortured logic to justify keeping these revenues that rightfully belong to Kittrell.

68.     On June 26, 2023, Defendant Shvartsman and two co-conspirators were indicted by a federal grand jury in the Southern District of New York for securities fraud.[46]

69.     On June 29, 2023, the Securities and Exchange Commission ("Commission) filed a civil complaint against Defendants Shvartsman, Rocket One Capital LLC, and two other co-conspirators for violations of the Securities Exchange Act of 1934 ("Exchange Act")[47]

70.     According to the indictment, Shvartsman's illegal insider trading activities overlapped with his actions set forth in this lawsuit.  On information and belief, the funds due Kittrell were used to help finance Shvartsman and Rocket One Capital's illegal securities activities.

---

[45] In its interrogatory responses Onecom admits: "Onecom received the funds associated with Plaintiff's paycard program."
[46] Exhibit KK.
[47] Exhibit LL.

## VI. CAUSES OF ACTION

71.     Plaintiff brings the following causes of action against the Defendants, jointly and severally. Plaintiff brings the following causes of action both congruently and in the alternative.[48]

72.     Count I (Money Had & Received), Count II (*Quantum Meruit*), and Count III (Contract-Implied-In-Law) are equitable claims which are similar in nature and involve overlapping elements.

73.     Count IV (Fraud) and Count V (Conspiracy) address the concerted fraudulent conduct of Defendants Shvartsman, Foster, and Park committed through the business Defendants.

74.     Count VI (Texas Theft Liability Act) is a statutory cause of action related to theft of monies and/or services.

75.     Count VII (Vicarious & Participatory Liability) addresses the individual and participatory liability of each of the Defendants and alleges joint and several liability based upon theories of alter ego, vice-principal liability, r*espondeat superior*, and actual / implied agency.  Plaintiff asks the Court to "pierce the corporate veil" of the Company Defendants to hold Shvartsman, Foster, and Parks liable for the acts of the Company Defendants.

---

[48] FRCP 8(d)(2), (d)(3); TRCP 47, 48

147998786.1

## COUNT I
## MONEY HAD AND RECEIVED
## (Against Onecom, Rocket One Capital, My Fast Funds, Shvartsman, and Foster)

76.    Plaintiff realleges and incorporates by reference the facts alleged in preceding paragraphs 16 – 73 and the exhibits associated thereto.  Specific exhibits which support the allegations in this count are cited in the footnotes below.

77.    The elements of a cause of action for money had and received are 1) the defendant holds money, and 2) the money belongs to the plaintiff in equity and good conscience.  See *Staats v. Miller*, 243 S.W.2d 686, 687-898 (Tex. 1951).

78.    It is uncontroverted that Onecom received the revenues generated by Kittrell's paycard program – Onecom admits it.[49]  The transfer of the monies generated by Kittrell is shown in the wire transfer of funds from Stride Bank to Onecom's account with OptimumBank from January 1, 2020 to termination of the Program in July, 2021.[50]

79.    On information and belief, the Program revenues were funneled through Onecom to its members, Rocket One and My Fast Funds, which were then transferred to Shvartsman and Foster, the sole owners of those member companies.[51]  Plaintiff alleges this Count against Rocket One Capital, My Fast

---

[49] See Exhibit MM – Onecom's Answer to Interrogatory No. 7 ("Onecom received the funds associated with Plaintiff's Paycard program")
[50] See Exhibit II – Onecom's bank statements.
[51] See ¶ XXXX – Vicarious and Participatory Liability

Funds, Shvartsman, and Foster to the extent the Kittrell funds received by Onecom was disbursed to them.

80.    The Program revenues received by Onecom and distributed to Rocket One, My Fast Funds, Shvartsman, and/or Foster belong to Kittrell in equity and good conscience.

**COUNT II**
***QUANTUM MERUIT***
**(Against Onecom)**

81.    Plaintiff realleges and incorporates by reference the facts alleged in preceding paragraphs 16 – 73 and the exhibits associated thereto.  Specific exhibits which support the allegations in this count are cited in the footnotes below.

82.    The elements of a cause of action for *quantum meruit* are 1) the Plaintiff provided valuable services; 2) the services were provided for the defendant; 3) the defendant accepted services; and 4) the defendant had reasonable notice that the plaintiff expected compensation for the services.  See *Hill v. Shamoun & Norman, LLP*, 554 S.W.3d 724, 732-33 (Tex. 2018).

83.    Kittrell provided valuable services and Onecom accepted them. Shvartsman admits this in his March 1, 2020 email to Kittrell when he states - "We appreciate the work you are doing and value your business."[52]  Shvartsman also states – "We want to help you grow your business and increase the revenues you see from the Kittrell Paycard program."[53]

---

[52] See Exhibit EE, Appendix – Vol. 5
[53] *Id.*

84.     Onecom had reasonable notice that Kittrell expected to be paid for the services.     As described in detail above,[54] Shvartsman, Foster, and Park orchestrated a scheme – deceiving Stride Bank, Kittrell, and the other participants in the Program – by which they contrived to transfer the revenue stream generated by Kittrell.   On December 25, 2019, six days after Shvartsman and Foster had founded Onecom, Kittrell sent an email to Foster and Park demanding the payment of past due commissions and seeking assurances of future payments.[55] Kittrell's July 31, 2020 email to Onecom[56] demanding payment further shows that Onecom knew that Kittrell expected payment.

85.     It is uncontroverted that Onecom received the revenues generated by the services provided by Kittrell's paycard program – Onecom admits it.[57]  The transfer of the monies generated by Kittrell is shown in the wire transfer of funds from Stride Bank to Onecom's account with OptimumBank from January 1, 2020 to termination of the Program in July, 2021.[58]

---

[54] Supra, pp. 7-11, ¶¶ 27-34 ("The Scam – Step One:  Transfer Stride Bank agreement from CP to Onecom.")
[55] See Exhibit I.
[56] See Exhibit NN (Appendix - Vol. 6).
[57] See Exhibit MM – Onecom's Answer to Interrogatory No. 7 ("Onecom received the funds associated with Plaintiff's Paycard program")
[58] See Exhibit II – Onecom's bank statements.

## COUNT III
## CONTRACT-IMPLIED-IN-LAW
## (Against Onecom)

86.     Plaintiff realleges and incorporates by reference the facts alleged in preceding paragraphs 16 – 73 and the exhibits associated thereto.  Specific exhibits which support the allegations in this count are cited in the footnotes below.

87.     The elements of a cause of action for a contract-implied-at law are 1) the plaintiff has conferred a benefit on the defendant; (2) the defendant has knowledge of the benefit; (3) the defendant has accepted or retained the benefit conferred and (4) the circumstances are such that it would be inequitable for the defendant to retain the benefit without paying fair value for it.  *Fortune Products v. Conoco, Inc.*, 52 S.W.2d 671, 684 (Tex. 2000).

88.     Kittrell provided valuable services by servicing the accounts it signed up under the Program, and Onecom accepted those services and the revenues that flowed from them. Shvartsman admits this in his March 1, 2020 email to Kittrell when he states - "We appreciate the work you are doing and value your business."[59] Shvartsman also states – "We want to help you grow your business and increase the revenues you see from the Kittrell Paycard program."[60]

89.     It is uncontroverted that Onecom received the revenues generated by Kittrell's paycard program – Onecom admits it.[61]   The transfer of the monies

---

[59] See Exhibit EE, Appendix – Vol. 5
[60] *Id.*
[61] See Exhibit MM – Onecom's Answer to Interrogatory No. 7 ("Onecom received the funds associated with Plaintiff's Paycard program")

147998786.1

generated by Kittrell is shown in the wire transfer of funds from Stride Bank to Onecom's account with OptimumBank from January 1, 2020 to termination of the Program in July, 2021.[62]

90.    On information and belief, the Program revenues were funneled through Onecom to its members, Rocket One and My Fast Funds, which then transferred the funds to Shvartsman and Foster, the sole owners of those member companies.

91.    The circumstances are such that it would be inequitable for the Defendants to retain the benefits conferred by Kittrell without paying fair value for it.

**COUNT IV**
**FRAUD[63]**
**(Against Shvartsman, Foster, and Park)**

92.    Plaintiff realleges and incorporates by reference the facts alleged in preceding paragraphs 16 – 73 and the exhibits associated thereto.  Specific exhibits which support the allegations in this count are cited in the footnotes below.

93.    The elements for a cause of action for fraud are 1) a false statement or omission concerning a material fact; 2) the representor's knowledge that the representation or omission is false; 3) an intention that the representation induce another to act on it; and 4) consequent injury by the party acting in reliance on the

---

[62] See Exhibit II – Onecom's bank statements.
[63] Cognizant of Rule 9(b) and this Court's Order [ECF No. 77] the particular circumstances constituting alleged fraud (date, name, and context) have been highlighted in **bold** font.

representation.  See *Zorrilla v. Aypco Constr. II, LLC,* 469 S.W.3d 143, 153 (Tex. 2015).

94.     Fraudulent misrepresentations include 1) false statements of fact, 2) false statements of opinion, 3) false statements of opinions bolstered by special knowledge, 4) false promises of future performance, 5) false representation by conduct, and 6) fraud by nondisclosure.  *Italian Cowboy Partners v. Prudential Ins.*, 341 S.W.3d 323, 337 (Tex. 2001) (1-3); *Aquaplex Inc. v. Rancho La Valencia, Inc.*, 297 S.W.3d 768, 774 (Tex. 2009) (4); *Ten-Cate v. First Nat'l Bank*, 52 S.W.2d 323, 326 (Tex.App.—Fort Worth 1932, no writ) (5); *Bradford v. Vento*, 48 S.W.3d 749, 754-55 (Tex. 2001) (6).

95.     As is set forth in detail above, Onecom, Shvartsman, Foster, and Park made numerous overt misrepresentations and omissions that they knew were false and misleading with the intent that Kittrell and others rely upon them.  Kittrell, in fact, relied upon them and suffered injury by losing the revenues it was due.

96.     Mary Kittrell had a **phone call** with **Foster** on or about **November 1, 2019** in which Foster assured her that **Kittrell would be paid for the past due revenues and would be paid on all earned revenues going forward**. Kittrell relied on these representations and continued to operate through the Program rather than seek an alternate program manager as she eventually wound up doing.

97.     Defendant's entire course of conduct consisted of one long drawn-out scheme to defraud all of the participants in the Program – Kittrell, Defendants' vendors, Stride Bank, and the other original stakeholders.

98.     On **August 4, 2019 Foster** demonstrated in an **email** that he was aware that the **processor system provider was about to terminate its services** thus rendering the entire Program inoperable.[64]  Foster did not disclose this to Kittrell.

99.     On **November 19, 2019 Foster** demonstrated in an **email** that he knew that **the Program was in financial difficulties.**[65] He did not disclose that to Kittrell despite Kittrell's demand for payment on October 7, 2019.[66]

100.    On **December 19, 2019, Shvartsman** formed Onecom[67] with the intent to liquidate all of Cardplatforms assets, including the revenue generated through Kittrell's paycard program.[68] Shvartsman did not disclose to Kittrell or any of the other stakeholders in the Program that he was preparing to liquidate the Program.

---

[64] Exhibit F – email from Foster to Stride Bank.
[65] Exhibit H – email from Foster to Stride Bank
[66] Exhibit G
[67] Exhibit H.
[68] "Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."  Rule 9(b).

101.   **Onecom published on its website** that it was the successor to Cardplatform and that this was a "Name change and new corporate brand identity."[69]  This was not true.

102.   Shvartsman, Foster, and Park conspired to have the revenue stream from the Program transferred to Onecom.  To accomplish this they had to deceive Stride Bank into agreeing to the transfer.  Specifically, they had to convince Stride Bank that Onecom was merely stepping into Cardplatform's shoes in the Program and hide the fact that they were actually transferring all of Cardplatform's assets to an undisclosed company owned by Cardplatform's investors.

103.   On **December 31, 2019, Foster and Shvartsman provided Stride Bank with two agreements**[70] between CP and Onecom:   1) an *Intellectual Property and Domain Name Assignment* ("IP Assignment")[71], and 2) a *Bill of Sale and General Assignment* ("Bill of Sale").[72]  These documents were fraudulent, and sent to Stride Bank with the intent to deceive it into transferring the Program's revenue stream to Onecom.  **Foster executed these fraudulent documents putatively on behalf of Cardplatform; Shvartsman on behalf of Onecom.**  During this time neither Shvartsman nor Foster disclosed to

---

[69] Exhibit NN (The launch date of the website is unknown).
[70] Neither of these documents were produced by Onecom in response to the limited discovery conducted so far in this matter.  These documents were recently obtained from Stride Bank pursuant to a subpoena.
[71] Exhibit K
[72] Exhibit L

Kittrell or any of the other Program stakeholders that they were attempting to transfer the Program assets to Onecom.

104.   On **January 16, 2020 Foster emailed** another **fraudulent (and unexecuted) Asset Purchase Agreement** to Stride Bank.  Foster knew that the assets of Cardplatforms were not being purchased by Onecom and contradicts the earlier (executed) agreement that represented that the asset purchase had already taken place.

105.   On January 27, 2020 Parks issued a statement that **Cardplatform would be closed**.  This statement was false.  The Onecom "deal" was already in the works.

106.   On **January 29, 2020 Parks emailed** Stride Bank his response to its queries about Onecom.[73]  In this email Parks states that **"Jeff is the sole party involved in forming Onecom."** The Certificate of Formation[74] shows that Shvartsman formed Onecom.  The Operating Agreement names My Fast Funds, LLC and Rocket One Capital, LLC as managing members with Rocket One Capital showing a capital contribution to the to the new LLC in the amount of $1,707,979.81.[75]    Both **Shvartsman and Foster** were copied on this email. Parks, Shvartsman, and Foster all failed to disclose to Kittrell, Stride Bank, or any of the Program stakeholders the transfer of the Program revenue flow to Onecom.

---

[73] Exhibit OO.  See ¶ 31, supra.
[74] Exhibit J (Appendix Vol. 2, p. 115).
[75] Exhibit J (Appendix Vol. 2, p. 159).

147998786.1

107.   On **February 6, 2020 (or January 31, 2020)**[76] **Foster** executed a **transfer of assets** from Cardplatform to CPAL.[77]   Neither Foster nor Park disclosed this to Kittrell, Stride Bank, or any of the Program stakeholders.

108.   The transfer from Cardplatforms to CPAL purports to transfer Kittrell's program agreement to CPAL.[78]   Neither Foster nor Park disclosed this to Kittrell.

109.   On **February 6, 2020 Shvartsman** executed a **Bill of Sale and General Assignment** purchasing certain assets from CPAL on behalf of **Onecom**.   He executed this as **Manager of Onecom.**   He did not disclose this to Kittrell or any of the other Program stakeholders.

110.   On **March 1, 2020** in an **email** to Kittrell[79], Shvartsman misrepresented that **Onecom had purchased the assets of CP** when in fact CPAL purchased the assets in order to liquidate CP and pay of the creditors.

111.   He further states in that email that **"Onecom is a separate entity from the former Card Platforms [CP] and in February we purchased the assets of CP."**   This contradicts the message on Onecom's website.   It also flies in the face of Park's assertions, infra, that Onecom has no relationship with Kittrell.

---

[76] The jurat has a different date than the document and appears to be from a different document.  The document was notarized by Defendant Park.
[77] Exhibit W
[78] Exhibit X (Appendix Vol. 4, p. 276).
[79] Exhibit EE.

112.     On **March 6, 2020 Parks** sent a letter to Kittrell wherein he states that **"a majority of the assets of Cardplatform LLC were acquired by Onecom, LLC."** As detailed above, this statement is false and misleading.  He further states that **"in light of your non-renewal your Agreement has not been assumed by Onecom, although Onecom has thus far maintained the services for your account."** This supports Count III, supra.  He also states that **"We will work with you and Stride Bank to develop the timeframes and notices for the cardholders."** This statement was false.  Onecom ignored and delayed the winddown activities which was not culminated until July 2021 all the while pocketing all of Kittrell's earnings.

113.     Kittrell justifiably relied on the false representations outlined above by Shvartsman, Foster, and Park and in reliance upon the correctness of the representations, acted upon them by continuing to operate through the Program rather than seeking an alternate program manager.

114.     As a result of Kittrell's reliance on the false representations of Shvartsman, Foster, and Park, Kittrell was damaged by Shvartsman, Foster, and Park, including through loss of additional revenue.

### COUNT V
### CONSPIRACY
### (Against Shvartsman, Foster, and Park)

115.     Plaintiff realleges and incorporates by reference the facts alleged in preceding paragraphs 16 – 73 and the exhibits associated thereto.  Specific exhibits which support the allegations in this count are cited in the footnotes below.

147998786.1

116.     The elements of civil conspiracy are 1) the defendant was a member of a combination of two or more persons, 2) the objected of the combination was to accomplish an unlawful purpose, or a lawful purpose by unlawful means, 3) the members had a meeting of the minds, 4) one of the members committed an unlawful, overt act to further the object, and 5) the plaintiff suffered injury as a proximate result of the wrongful act.  *Agar Corp. v. Electro Circuits Int'l*, 580 S.W.3d 136, 141 (Tex. 2019).

117.     Shvartsman, Foster, and Parks are a member of a combination of two or more persons.

118.     Fraud (Count IV) is an unlawful purpose which supports a claim of civil conspiracy.[80]  Theft (Count VI) is also an unlawful purpose which supports a claim of civil conspiracy.

119.     On information and belief, Shvartsman, Foster, and Park had a meeting of the minds.  As alleged above in Count IV, they worked in concert to develop, plan, and implement the scheme to divert and keep Kittrell's program revenues as set forth in Count IV, supra.

120.     As alleged above in Count IV, Shvartsman, Foster, and Park each took overt and unlawful acts in order to further their scheme.

121.     On information and belief, the Program revenues were funneled through Onecom to its members, Rocket One and My Fast Funds, which then

---

[80] *Ernst & Young, LLP v. Pacific Mut. Life Ins.*, 51 S.W.3d 573, 583 (Tex. 2010).

147998786.1

transferred the funds to Shvartsman and Foster, the sole owners of those member companies.

## COUNT VI
## TEXAS THEFT LIABILITY ACT
## (Against Onecom, Shvartsman, Foster, and Parks)

120.   Plaintiff realleges and incorporates by reference the facts alleged in preceding paragraphs 16 – 73 and the exhibits associated thereto.  Specific exhibits which support the allegations in this count are cited in the footnotes below.

121.   The elements of a cause of action under the Theft Liability Act are 1) the plaintiff had a possessory right to the property, 2) the plaintiff unlawfully appropriated the property without the plaintiff's effective consent, 3) the defendant appropriated the property with the intent to deprive the plaintiff of the property, and 4) the plaintiff sustained damages as a result of the theft. [81]

122.   Kittrell has a possessory right to the revenues generated through its paycard program.  Under the Texas Penal Code the word "owner" has an expansive meaning and includes anyone having a possessory interest in the property through a greater right of possession.[82]

123.   Onecom, Shvartsman, Foster, and Park intentionally brought about a transfer by both exercising control over the funds that were due Kittrell and by bringing about a transfer of the funds due Kittrell.[83]

---

[81] Tex. Civ. Prac. & Rem. Code §§134.001 *et seq*.; Tex. Penal Code §§31.03, 31.04.
[82] See Tex. Pen. Code §1.07(a)(34)(A); *Freeman v. State*, 707 S.W.2d 597, 603 (Tex.Cr..App. 1986).
[83] See Tex. Pen. Code §31.01(4)(A), (4)(B).

147998786.1

124.    Kittrell did not consent.

125.    Kittrell provided services to the Program.   Onecom, Shvartsman, Foster, and Park knew that Kittrell provided these services for compensation and knowingly diverted these services, to which they were not entitled but over which they had control, to their own benefit or to the benefit of another person not entitled to it.[84]

126.    Onecom, Shvartsman, Foster, and Park intended to avoid payment for the services provided by Kittrell to the Program.

**COUNT VII**
**PARTICIPATORY & VICARIOUS LIABILITY**
**(Against all Defendants).**

127.    Plaintiff asks the court to disregard the corporate forms of Onecom, Rocket One Capital, and My Fast Funds, and pierce the corporate veil.   Onecom was used as a sham to perpetrate a fraud.[85]   A common pattern for a sham to perpetrate a fraud is when former shareholders of a corporation siphon off corporate revenues and sell corporate assets to avoid corporate debt, and then form a new corporation to conduct the same business with the same shareholders.[86]

128.    The allegations set forth in Counts I -VII show that Onecom, Rocket One Capital, and My Fast Funds were used specifically to unlawfully divert funds

---

[84] See Tex. Pen. Code §31.04(a)
[85] See *Castleberry v. Branscum*, 721 S.W.2d 270, 271-72 (Tex. 1986).
[86] See *Love v. State*, 972 S.W.2d 114, 117 (Tex.App.—Austin 1998, pet. denied).

147998786.1

from the Program.  These three business entities are solely owned, controlled, and operated by Defendants Shvartsman, Foster, and Park.  At all times Shvartsman, Foster, and Park were acting as agents for the company Defendants.  They were also vice-principals of the company Defendants – owners, officers, and managers.

129.   Plaintiff asks that the Defendants be held jointly and severally liable for their collective and individual acts as part of a joint scheme.

## VII.  DAMAGES / REMEDIES

130.   Plaintiff asks the Court to award the following damages and remedies wholly or in the alternative:

    a.  Actual damages

    b.  Exemplary damages

    c.  Constructive trust

    d.  Disgorgement

    e.  Attorney fees

    f.  Prejudgment and postjudgment interest

    g.  Cost of court

## IX.  PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays FOR JUDGMENT AGAINST Defendants and that:

    a.  Plaintiff be granted judgement against Defendants, jointly and severally, and the relief requested herein be awarded to Plaintiff;

    b.  Plaintiff be granted judgment for all costs of court; and

147998786.1

    c.  Plaintiff be granted all further relief to which Plaintiff may be entitled in either law or equity.

Dated:  July 31, 2023        Fox Rothschild LLP
777 S. Flagler Drive
Suite 1700 – West Tower
West Palm Beach, FL 33401
Tel: (561) 804-4419

By:  */s/ Heather L. Ries*
Heather L. Ries
Florida Bar No.: 581933
hries@foxrothschild.com

By: /s/ David N. Anderson
David N. Anderson (Pro Hac Vice)
Texas Bar No. 24028045
THE ANDERSON LAW FIRM
4309 Yoakum
Houston, TX  77006
(713) 521-6563
danderson@lodna.net